IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ANTHONY and MELISSA STONECIPHER**,

      Plaintiffs,

v.                                          **No. 11-0417 JCH/GBW**

**SPECIAL AGENTS Carlos VALLES,
John ESTRADA, Matt CRECILIUS, David TABULLO,
McCARTHY, KING, JORGENSEN, Bureau of Alcohol,
Tobacco, Firearms, and Explosives; Alamogordo
City Police Department Officer Luis HERRERA;
United States Marshals John DOEs;
Doña Ana County Sheriff's Officers John DOEs;
CITY OF ALAMOGORDO;
BOARD OF COUNTY COMMISSIONERS OF
DOÑA ANA COUNTY; the UNITED STATES OF
AMERICA,**

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

THIS MATTER comes before the Court on the remaining[1] federal Defendants Special

Agents ("SA") Carlos Valles', John Estrada's, David Tabullo's, Peter McCarthy's, Dennis King's,

and Karl Jorgensen's *Renewed Motion to Dismiss or, in the Alternative, for Pre-discovery Summary*

*Judgment*, filed June 4, 2012 (Doc. 90). The individual federal Defendants seek dismissal of and/or

summary judgment on, all of the Plaintiffs' remaining claims for violation of their First and Fourth

Amendment rights. The remaining claims are as follows: Count I- Anthony Stonecipher's

---

[1] Plaintiffs voluntarily dismissed Matt Crecilius as a defendant on September 26, 2011. *See* Doc. 49. They voluntarily dismissed their claims against the City of Alamogordo on December 14, 2011. *See* Doc. 54. The Court dismissed the United States of America and the Board of County Commissioners of Doña Ana County as parties on January 5, 2012, after dismissing claims against them, *see* Docs. 55, 56. The Court granted the Plaintiffs' motion to dismiss all claims against the Doña Ana County Sheriff's Officers John Does on March 6, 2012. *See* Doc. 70. The Court dismissed all claims against Officer Luis Herrera of the Alamogordo City Police Department on March 28, 2013. *See* Doc. 125.

[hereinafter "Anthony"] claim for unreasonable seizures and false arrest; Count II - Anthony's claim for unreasonable search; Count III - Anthony's claim for malicious prosecution against SA Valles; Count IV - Anthony and Melissa Stonecipher's [hereinafter "Melissa"] claims for unlawful entry; Count V- Anthony's claim for excessive force; Count VI - Melissa's claim for unreasonable seizure and false arrest; and Count IX - Anthony and Melissa's First-Amendment retaliation claims, which all are brought under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

After reviewing the briefs and evidence submitted by the parties, as well as the controlling precedent and applicable authorities, the Court concludes that the motion should be granted because Plaintiffs failed to meet their burden to make sufficient allegations, grounded in the record, that these Defendants violated their constitutional rights, and because the undisputed evidence demonstrates that the Defendants are entitled to qualified immunity.

## LEGAL STANDARDS

### I. Motions to Dismiss.

A motion to dismiss, including one based on qualified immunity, must be decided by accepting the well-pleaded facts of the complaint as true and analyzing those facts under the standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  *See Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).  The assumption that all facts in the complaint are true, however, is inapplicable when the complaint relies on a recital of the elements of a cause of action and supports those elements only with conclusory statements. *See Iqbal*, 556 U.S. at 678-79. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Federal Rule of  Civil Procedure 8(a)(2)).  In addition," documents referred to in the

2

complaint may be considered at the motion-to-dismiss stage if they are 'central to the plaintiff's claim' and their authenticity is undisputed." *Phillips v. Bell*, No. 08–1420, 365 Fed. App'x 133, 137, 2010 WL 517629, *3 (10th Cir. Feb. 12, 2010) (considering the search warrant and supporting affidavits referenced in the complaint in analyzing the issue of qualified immunity that was raised in motion to dismiss, and quoting *Alvarado v. KOB–TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007)).

### II.  Motions for Summary Judgment.

When a defendant files a motion for summary judgment on the issue of qualified immunity and submits additional evidence, in contrast, the Court may consider the whole summary-judgment record to decide the qualified-immunity issue, and plaintiffs may not rest upon the allegations in their complaint.  Because the remaining federal Defendants rely heavily on affidavits and other evidence and have brought their motion alternatively as one for summary judgment, the Court will principally analyze their motion under the appropriate summary-judgment standards.

Summary judgment generally is appropriate when a court determines that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a)[2]; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (noting that a summary judgment movant need not negate all the nonmovant's claims, but need only point to an "absence of evidence to support the nonmoving party's case"). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

[2]Rule 56 was amended, effective December 1, 2010. The summary judgment standard previously enumerated in subsection (c) was moved to subsection (a), and there was one word change from the previous version – genuine 'issue' became genuine 'dispute.' *See* FED. R. CIV. P. 56 advisory committee note (2010 Amendments). But the "standard for granting summary judgment remains unchanged." *Id.*

judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The standard for analyzing a motion for summary judgment shifts, if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983 or *Bivens*. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment-showing that there are no genuine issues of material fact and that he . . . is entitled to judgment as a matter of law."  *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

"[O]nce [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . the reasonableness of [the officer's] actions. . . is a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original).  Consistent with the Supreme Court's opinion in *Scott*, the Honorable Jerome A. Holmes of the Tenth Circuit Court of Appeals wrote, in a concurring opinion, a very useful discussion for district courts that sheds "some clarifying light on the process of applying the summary judgment standard of review in the qualified immunity setting."  *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J. concurring).

> In addressing the legal issue in the qualified immunity context of a violation *vel non* of a clearly established constitutional right, however, the principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact is different than it is in the traditional summary judgment analytic paradigm. Specifically, contrary to the latter, the objective is not to determine whether a

4

plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury.  Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court. . . .

It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden of demonstrating the violation of a constitutional right that was clearly established, that courts should be concerned with the *true* factual landscape—as opposed to the factual landscape as plaintiff would have it.  Based upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law.  *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) ("If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." (internal quotation marks omitted)); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quoting *Medina* ); *see also Gallegos v. City & County of Denver*, 984 F.2d 358, 361 (10th Cir.1993) ("Only after plaintiff has met this initial [two-part qualified immunity] burden does the burden shift to defendants to prove that no genuine issue of material fact exists.") . . . . .

*Id.* at 1326-27 (footnote omitted) (italics in original).  Even if the plaintiff crosses the initial hurdle and the burden shifts to the defendant to show that no genuine issue of material facts exist, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380.

### III.  Qualified immunity.

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 -1245 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ——, ——, 131 S. Ct. 2074, 2085 (2011) (further internal quotation marks omitted)).

5

Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in "objective good faith." *United States v. Leon*, 468 U.S. 897, 922–923, 104 S.Ct. 3405, 82 L. Ed. 2d 677 (1984). Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S., at 341, 106 S. Ct. 1092. The "shield of immunity" otherwise conferred by the warrant, *id.*, at 345, 106 S. Ct. 1092, will be lost, for example, where the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S., at 923, 104 S.Ct. 3405 (internal quotation marks omitted).

Our precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be. As we explained in *Leon*, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.*, at 921, 104 S. Ct. 3405; see also *Malley, supra*, at 346, n. 9, 106 S.Ct. 1092 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable" (internal quotation marks and citation omitted)).

*Id.* at 1245 (footnotes omitted). "[T]he inquiry under our precedents is whether 'a reasonably well-trained officer in petitioner's position would have known that *his affidavit* failed to establish probable cause." *Malley*, 475 U.S., at 345, 106 S .Ct. 1092 (emphasis added)." *Id.* at 1248 n.6. "The fact that the officers secured [] approvals [for a warrant from the district attorney] is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause." *Id.* at 1250. Thus, under the principle of "arguable probable cause," "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Cortez v. McCauley*, 478 F.3d 1108, 1120 & n. 15 (10th Cir. 2007) (en banc).

6

### IV.  Fourth Amendment - Probable cause.

> The substance of all the definitions of probable cause is a reasonable ground for belief of guilt. And this 'means less than evidence which would justify condemnation' or conviction . . . . Probable cause exists where the facts and circumstances within their (the officers') knowledge, and of which they had reasonably trustworthy information, (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

*Brinegar v. United States*, 338 U.S. 160, 175-76 (1946) (internal quotation marks and citations omitted)(parentheticals in original).  "[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested."  *Beard v. City of Northglenn*, 24 F.3d 110, 114 (10th Cir. 1994).

> When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.  But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (internal quotation marks and  bracket omitted). Thus, "the Fourth Amendment's warrant requirement is violated when 'a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit' if the false statement is necessary to a finding of probable cause."  *Clanton v. Cooper*, 129 F.3d 1147, 1154 (10th Cir. 1997) (quoting *Franks*, 438 U.S. at 155-56).)

Similarly,  a plaintiff alleging that his constitutional right to due process was violated by a malicious prosecution must show, as an essential element of his claim that "there was no probable cause to support the original arrest, continued confinement, or prosecution."  *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007); *see Kerns v. Bader*, 663 F.3d  1173, 1190 (10th Cir.

7

2011), *cert. denied*, 133 S. Ct. 645, 184 L. Ed. 2d 457, 81 USLW 3286 (Nov 26, 2012) (concluding that "[t]he existence of probable cause disposes of all of [plaintiff's federal] claims [for false arrest/imprisonment and malicious prosecution]").

### V.  Excessive force.

"To establish a constitutional violation [for excessive force], the plaintiff must demonstrate the force used was objectively unreasonable." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).  "We assess objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." *Id.* at 1260 (internal quotation marks omitted).  "In determining whether a plaintiff's constitutional rights were violated we ordinarily, as here, adopt plaintiff's version of the facts, insofar as it is supported by the record." *Thomson*, 584 F.3d at 1318.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  But in responding to a summary-judgment motion, the plaintiff must show more than just a de minimus injury caused by the excessive use of force.  *See Koch v. City of Del City*, 660 F.3d 1228, 1247-48 (10th Cir.  2011) (stating, in affirming grant of qualified immunity on summary judgment, that "to succeed on her claim, Ms. Koch must show an actual injury that is not de minimis").

### UNDISPUTED FACTS

"On December 5, 2009, Plaintiff [Melissa Stonecipher, using the name] Melissa Ann Johnson made a multiple purchase of twelve handguns" from a firearms dealer in Alamogordo, New

8

Mexico.  *See* Doc. 90-1 at 6 (Warrant ¶ 4)[3].  She also made two other handgun purchases during a 10-month period.  *See id.*  But Melissa had married Anthony in August, 2007 and had legally changed her name to Melissa Stonecipher in July 2009, so she did not use her legal name for the purchases made after July 2009.  *See id.* at ¶ 5; *see* Am. Compl. (Doc. 5) at 4, ¶ 15.  The same firearms dealer had refused to sell guns to Anthony on August 9, 2007, after conducting a "National Instant Criminal Background Check System (NICS)" and finding a domestic-assault conviction. Doc. 90-1at 6, ¶ 6.  On January 1, 2010, Anthony and Melissa were at a party at the VFW , where Anthony offered to sell handguns to Matt Crecilius, the Flight Chief of the Air Force's 49th Security Squadron.  *See id.* at 6-7, ¶ 7.  Crecilius reported the incident to SA Valles, an employee of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  *See id.* at 6, ¶ 7.  SA Valles began an investigation into Anthony's criminal history.   SA Valles obtained certified court documents establishing that Anthony pleaded guilty on April 16, 2007 in Missouri to the misdemeanor charge of "Domestic Assault - 3d Degree."  Doc. 110-1 at 4 (certified copy of docket sheet and judgment); Doc. 90-1 at 7, ¶ 8.  The Missouri Court imposed a "[s]uspended imposition of sentence" consisting of one year of supervised probation.  *See* Doc. 110-1 at 4.  On April 16,

---

[3] The Plaintiffs generally do not dispute the material factual background leading up to the afternoon of Anthony's arrest that supports probable cause, other than to argue that Anthony's domestic-violence conviction should not have been counted as a conviction for the purpose of determining whether he is barred from possessing firearms under 18 U.S.C. § 922(g)(9), and to say that they cannot confirm or deny the actions SA Valles took, and the advice AUSA Ron Jennings gave to SA Valles, before SA Valles applied for the warrant and filed the criminal complaint.  *See* Doc. 101 at 4, 9-23.  The documents that SA Valles obtained, however, are dated, *see, e.g.*, Doc. 91-1 at 20 (NICS report showing a "print date" of "December 8, 2009), thus there is no genuine issue of material fact regarding when he obtained them during his investigation.  The Court also notes that, while the Plaintiffs' response brief at times contends that certain facts set forth by the Defendants are disputed, Plaintiffs sometimes do not support bald contentions with affidavits or other admissible evidence. *See, e.g.* Doc. 101 at 16, ¶¶ 23, 25; *id.* at 17, ¶¶ 29,30; *id.* at 18, ¶ 35; *id.* at 21, ¶ 54.

2008, after Anthony successfully "served term of probation and paid all monies due[, the] court []
discharge[d him] from probation." *Id.* at 6. SA Valles also obtained an NICS report showing that
Anthony had been denied the right to purchase a gun in 2007, *see* Doc. 91-1 at 19-25 & 91-2 at 1;
Doc. 101 at 11, ¶ 6 (admitting that Anthony had been denied the purchase of a gun from a federally-
licensed dealer), and a 12/8/2009 NCIC report, *see* Doc. 91-2 at 2-5. The NICS denial report states:
"Subject has been convicted of a Misdemeanor Crime of Domestic Violence." Doc. 91-1 at 20. The
words "COURT ACTION: GUILTY - SIS" are found on page 8 of the NICS denial report and on
page 3 of the NCIC report; and at the bottom of the last page of each report it says: "SUSPENDED
IMPOSITION OF SENTENCE DISPOSITIONS ARE NOT CONVICTIONS AND ARE CLOSED
RECORDS WHEN PROBATION IS COMPLETED." Doc. 91-2 at 1, 5. Nowhere on the reports,
however, do they indicate that "SIS" means "SUSPENDED IMPOSITION OF SENTENCE."

      After obtaining these documents, SA Valles and SA Joel Marquez, an ATF explosions
specialist, conferred with Assistant United States Attorney (AUSA) Ron Jennings to obtain
Jenning's legal determination whether Anthony's 2007 conviction would legally bar Anthony from
possessing firearms under 18 U.S.C. § 922(g)(9), which prohibits anyone

> who has been convicted in any court of a misdemeanor crime of domestic violence,
> to . . . possess in or affecting commerce, any firearm or ammunition; or to receive
> any firearm or ammunition which has been shipped or transported in interstate or
> foreign commerce.

On February 1, 2010, after reviewing Anthony's misdemeanor information; the judgment and
sentence; the NICS denial report, and the NCIC report, AUSA Jennings advised SA Valles and SA
Marquez that Anthony was, in fact, prohibited from possessing firearms pursuant to § 922(g)(9).
Doc. 90-4 at 2-3 (Jennings Aff. at ¶¶ 3-11); Doc. 91-1 at 2-3 (Valles Aff. ¶¶ 6-11); Doc. 90-3 at
(Marquez Aff. at ¶¶ 5-8).

On March 8, 2010, Crecilius met with Anthony, who again offered to sell Crecilius two handguns. Doc. 90-1 at 7, ¶ 9. On March 16, 2010, SA Valles and SA John Estrada, pretending to be related to Crecilius, accompanied Crecilius to Anthony's and Melissa's house and purchased a handgun and two exploding targets. *See id.* at 7-8, ¶¶ 10-11, 14. The handgun was one of the many handguns that Melissa had purchased on December 5, 2009. *See id.* at 9, ¶ 17; Doc. 101 at 17, ¶ 28. Anthony also showed SA Valles and SA Estrada his firearms inventory and "physically demonstrated how his AK-47 could be easily converted to a machine gun with a paperclip." Doc. 91-1 at 4, ¶ 14 (Valles Aff.); Doc. 90-9 at 2, ¶ 8; *and see* Doc. 101 at 16, ¶ 23 (stating that "Plaintiff vigorously disputes that he 'demonstrated' how he could easily make an illegal conversion, only that he stated that he possessed the knowledge on how to do so," but failing to support that statement with an affidavit). Anthony also showed the agents a Hi-Point carbine rifle that he claimed to have unintentionally converted to be fully automatic by polishing the sear, although he declined to sell it at that time. Doc. 90-1 at 8, ¶ 12. On May 5, 2010, however, Anthony offered to sell the carbine to SA Valles. *See id.* at 10, ¶ 23. SA Valles established that Anthony bought and sold guns, gun parts, and ammunition on the website gunbroker.com, and he identified two guns that Anthony sold to a dealer in Texas. *See id.* at 9, ¶¶ 19-20. SA Valles also confirmed that neither Anthony nor Melissa had a Federal Firearms License, nor had they registered any gun with the National Firearms and Transfer Record. *See* 91-1 at 5, ¶¶ 23-24.

Between May 13-17, 2010, AUSA Jennings reviewed and approved SA Valles' affidavit and application for a search warrant for the Stonecenters' house. *See* Doc. 90-4 at 3, ¶¶ 12-16 (AUSA Jennings Aff.). SA Valles did not mention in his affidavit that the Missouri judgment stated that there was a "suspended imposition of sentence," because SA Valles did not know that those words "had any legal significance as to a conviction" when a defendant had pleaded guilty to a crime. Doc.

91-1 at 11, ¶ 59 (SA Valles Aff.).  On May 17, 2010, a federal magistrate judge granted SA Valles'

application for a search warrant based on SA Valles' belief that Anthony had violated 18 U.S.C. §

922(g)(9).  *See* Doc. 90-1 at 1, 13.  On May 18, 2010, SA Valles, along with other ATF agents,

executed the warrant, searched the Stoneciphers' residence and arrested Anthony.

After he had been arrested, and during the course of the search, Anthony asked for, and was

granted, permission to retrieve documents from a filing cabinet, including a letter signed by James

Cooksey, Anthony's purported attorney in the Missouri domestic-violence case.  *See* Doc. 91-1 at

8, ¶¶ 42-43.  The letter, dated April 16, 2007, noted that Anthony had "pled guilty to the charge of

Domestic Assault," but informed Anthony that, "if . . . you serve out your probation . . . you do not

have a conviction on your record."  Doc. 23-2 at 1 (letter from Cooksey).  Anthony read at least part

of the letter aloud to SA Valles and SA Estrada and perhaps to other agents, and SA Valles read the

letter himself.  *See* Doc. 101 at 27, ¶ 12; Doc. 91-1 at 8, ¶¶ 42-43.  But because Cooksey's statement

conflicted with the legal determination made by AUSA Jennings, SA Valles and the other agents

continued with the arrest and search.  *See* Doc. 91-1 at 8, ¶ 43 (Valles Aff.); Doc. 90-9 at 6, ¶¶ 27-28

(Estrada Aff.).  ATF officers took all of the documents that Anthony produced, including an NCIC

report dated 1/26/2007.  This report was compiled after Anthony had been arrested but before he

pleaded guilty; it therefore showed "0" convictions and did not include the disposition of the case.

*See* Doc. 24-1 at 1-3 (NCIC report Anthony submitted to prior summary-judgment record).  The

NCIC report contained the language quoted *supra* about suspended impositions of sentences not

being convictions, but it did not indicate that a suspended imposition of sentence had been imposed

in Anthony's case.  *See id.*  SA Valles and SA Estrada swear, and Anthony does not contradict the

sworn testimony, that Anthony "did not read any other document to the ATF agents or specifically

reference any other document to the ATF agents at the time of his arrest and/or search of his

premises." Doc. 91-1 at 8, ¶ 44 (Valles Aff.); Doc. 90-9 at 6, ¶ 29 (Estrada Aff.). Thus, the agents

who conducted the search and arrested Anthony all swear that they "believed they had probable

cause to arrest Anthony Stonecipher based on information furnished to them by SA Valles, their

knowledge of ATF's investigation that Mr. Stonecipher was unlawfully in possession of a firearm,

and that he was unlawfully manufacturing and selling explosives." Jorgensen Aff. at ¶¶ 18-19; King

Aff. at ¶¶ 18-19; McCarthy Aff. at ¶¶ 15-16; Tabullo Aff. at ¶¶ 17-18.

SA Valles informed AUSA Jennings of the letter, and Jennings advised him that more

investigation should be conducted into the letter and Missouri law, thus SA Valles, with Jennings'

review and approval, filed a criminal complaint against Anthony for violation of 18 U.S.C. §

922(g)(9). *See* Doc. 91-1 at 9, ¶¶ 48-51. AUSA Jennings made the decision to prosecute Anthony.

*See* Doc. 90-4 at 4, ¶¶ 20-21.

> On May 25, 2010, the prosecuting United States Attorney advised Magistrate Judge
> Lourdes A. Martinez that Anthony Stonecipher did not have a conviction for
> domestic violence, and she dismissed the single charge against him for violating 18
> U.S.C. § 922(g)(9). Doc. 23, Ex. 3 (Clerk's Minutes).
>
> Plaintiffs subsequently filed this action against both state and federal law
> enforcement, alleging violations of their civil rights, as guaranteed by the Fourth and
> Fourteenth Amendments, and state-law tort claims. With few exceptions, the
> Complaint fails to specify the individual actions of the law enforcement officers, but
> instead generally directs the separate counts at all defendants.

March 28, 2013 Memorandum Opinion and Order ("MOO") at 2 (footnote omitted).

## ANALYSIS

Plaintiffs contend that the Court should reach the same result in regard to this motion as it

did in resolving the Defendants' previous motions to dismiss, stating that "nothing has changed"

since the Court issued its January 5, 2012 MOO. Doc. 119 at 3-4, 7. But the Defendants have now

alternatively also moved for summary judgment and supplied additional undisputed factual

information, and the Court previously noted that, "[a]t this stage of the proceedings, it is unclear whether Agent Valles omitted the information about Anthony Stonecipher's SIS out of mere negligence or whether the omission was intentional or the result of a reckless disregard for the truth." January 5, 2012 MOO at 11. Accepting the Plaintiffs' allegations as true, the Court denied the prior motion to dismiss in part and granted it in part. *See id.* As noted, the Court is analyzing the motion at bar under the standards for summary judgment.

**I. Defendants are entitled to qualified immunity on Counts I-IV.**

Counts I-IV allege unconstitutional entry and search of the Stoneciphers' home and unlawful/unconstitutional seizure, arrest and prosecution of Anthony. Defendants contend that they are entitled to qualified immunity on these claims because:

> (1) the ATF investigation showed Plaintiff Anthony Stonecipher was in violation of Federal explosives laws, that he had a prior adverse MCDV judgment, and that he demonstrated for ATF agents how he converted a firearm to be fully automatic; (2) the search warrant and supporting probable cause affidavit, and the criminal complaint and supporting affidavit were reviewed by an Assistant United States Attorney prior to being presented to the Court; and (3) the ATF agents acted pursuant to a lawful, constitutional, and facially valid warrant.

Doc. 90 at 19. To overcome the defense of qualified immunity, Anthony and Melissa must show that their "factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question" whether the Defendants violated their constitutional rights. *Thomson*, 584 F.3d at 1326. Further, they also must set forth facts, grounded in the record, showing that the actions of each individual agent violated clearly established law and were objectively unreasonable. *See Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011) ("Personal liability for Constitutional violations must be based on personal involvement in the alleged constitutional violation.") (internal quotation marks omitted).

Anthony and Melissa contend that the search of their home, Anthony's arrest and

prosecution, and Melissa's seizure during the time the search was conducted were unlawful and

unconstitutional because "SA Valles intentionally misinformed the Court that Plaintiff Anthony

Stonecipher had been convicted of a domestic assault charge in Missouri, which would prohibit him

from owning or transferring a firearm under 18 U.S.C. § 922(g)(9)" when "no such certified copy

of a conviction exists or existed," thus the search, seizure, arrest and prosecution were not supported

by probable cause. Doc. 101 at 4. But the Stoneciphers must "make a substantial showing" that SA

Valles included " deliberate falsehood[s]" in his affidavit or acted in "reckless disregard for truth,"

*Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990); *Clanton*, 129 F.3d at 1154, and they have not

made such a showing. The court documents that SA Valles saw before he submitted his affidavit

for a search warrant conclusively show that Anthony pleaded guilty to a misdemeanor domestic-

violence charge. *See* Doc. 110-1 at 4. Although the docket sheet shows that the Missouri court

imposed a "[s]uspended imposition of sentence" consisting of one year of supervised probation, *see

id.*, nowhere on the docket sheet does it indicate the legal significance of such a sentence on the

conviction. Similarly, the NICS denial report that SA Valles obtained based the denial of a gun sale

to Anthony on the factual finding that "Subject has been convicted of a Misdemeanor Crime of

Domestic Violence." Doc. 91-1 at 20. And although the words "COURT ACTION:  GUILTY -

SIS" are found on page 8 of the NICS denial report and on page 3 of the NCIC report; and at the

bottom of the last page of each report it says: "SUSPENDED IMPOSITION OF SENTENCE

DISPOSITIONS ARE NOT CONVICTIONS AND ARE CLOSED RECORDS WHEN

PROBATION IS COMPLETED." Doc. 91-2 at 1, 5, nowhere on the reports does they indicate that

"SIS" means a "SUSPENDED IMPOSITION OF SENTENCE."  SA Valles, who is not an attorney,

swears that he was not aware of the legal significance of the term "SIS," or "suspended imposition

of sentence," and, critically, it is undisputed that SA Valles reasonably sought the professional

15

opinion of AUSA Jennings to determine the legal significance of Anthony's 2007 guilty plea and sentence. It is further undisputed that AUSA Jennings advised Valles that the Missouri conviction was, in fact, sufficient for purposes of barring Anthony from possessing firearms under federal law after reviewing everything that SA Valles had seen. As in *Messerschmidt,* SA Valles' detailed warrant application truthfully laid out the pertinent legal facts *as he reasonably understood them to be* after being advised by AUSA Jennings. The fact that SA Valles sought and obtained approval of the warrant application from the AUSA before submitting it to the magistrate judge supports the conclusion that, as a matter of law, Valles reasonably believed that the warrant was supported by probable cause. *Cf. Messerschmidt*, 132 S. Ct. at 1249. SA Valles "took every step that could reasonably be expected of [him]." *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984). In light of these facts, it cannot be said that SA Valles' " warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," *Malley v. Briggs*, 475 U.S. 335, 244-45 (1989), or that "no officer of reasonable competence would have requested the warrant," *id*. at 346, n. 9. "Indeed, a contrary conclusion would mean not only that [SA Valles was] plainly incompetent," but that AUSA Jennings was, as well. *Messerschmidt*, 132 S. Ct. at 1249 (internal quotation marks and citation omitted).

The Stoneciphers' bald statement that "[a]ccording to the Missouri Court, Plaintiff did not have any weapons restrictions placed upon him, so long as he abided by a no-contact order with his former wife," Doc. 101 at 4-5, is not supported by the certified copy of the Missouri judgment, which is silent regarding weapons restrictions. Similarly, their statement that Anthony's "misdemeanor domestic assault charge, follow[ed] a verbal altercation with his former wife," *id.* at 4, is contradicted by the 2009 NICS report, which states that Anthony's former wife "reported she was thrown to the ground by her husband." Doc. 91-1 at 22.

Citing to documents attached at Docket number 24 in this case, the Stoneciphers argue that SA Valles and the other Defendants did not have probable cause to continue the search or to arrest Anthony after Anthony read parts of the letter from his attorney to the agents during the search, and after they saw the NICS report and NCIC report that showed "0" convictions. Doc. 101 at 5. They also contend that the "Missouri State Highway Patrol Criminal History Record" attached to their Response to the Federal Defendants first Motion to Dismiss "also warned any reviewing official that 'suspended imposition of sentence dispositions are not convictions and become closed records when probation is completed or finally terminated,'" and that " a redacted and unofficial copy of the Plaintiff's FBI report was attached in the response, definitively demonstrating that Plaintiff has never been convicted of any crime, as available to the responding ATF agents, before, during, and after the arrest." Doc. 101 at 5. The Court notes, however, that Anthony does not rebut SA Valles' and SA Estrada's testimony that Anthony did not read aloud from any document other than his attorney's letter at the time the search was being conducted, and that he also did not point to anything in any other document indicating that his domestic-violence conviction – upon satisfactory completion of probation –  would no longer be legally considered as a conviction. Doc. 91-1 at 8, ¶ 44 (Valles Aff.); Doc. 90-9 at 6, ¶ 29 (Estrada Aff.).  As noted, *supra*, the NCIC report Anthony apparently had at his house was dated 1/26/2007– **before** Anthony pleaded guilty and before any ruling had been made regarding his arrest, so the fact that there was a "0" under the section for convictions in that report had no legal significance whatsoever at that time.  *See* Doc. 24-1 at 1-3. Further, Anthony has submitted nothing to show that either the Missouri State Highway Patrol Criminal Report, which was created on August 21, 2010, *see* Doc. 24-2 at 1-6, or the FBI report, which was created on 8/25/2010, *see* Doc. 24-3 at 3, have any relevance to the issue of what SA Valles or the other officers knew or should have known on or before May 18, 2010, when they

17

conducted the search and arrested Anthony. *See Beard*, 24 F.3d at 114 (noting that probable cause must support a warrant "at the time of its issuance. . .  even if later events establish that the target of the warrant should not have been arrested").  In short, the Stonecipher' conclusion that, despite AUSA Jennings' legal advice to the contrary, SA Valles and the other officers knew or were recklessly unaware that they lacked probable cause to search the Stoneciphers' home and arrest Anthony is unsupported.   Thecontention that the agents independently understood the legal significance of a suspended imposition of sentence on a domestic-violence conviction from another state is contrary to the undisputed record, and the Defendants are entitled to qualified immunity.

## II.  Defendants are entitled to qualified immunity on Count V.

Anthony's  First Amended Complaint (which is incorporated into his Second Amended Complaint) factually alleges that, during his arrest, Anthony  was "turn[ing] to leave back to the safety of his own home" when he "was taken to the dirt and handcuffed, causing injury to his back." Doc. 5 at 8, ¶ 41.  He concludes in Count V of his Amended Complaint that "Defendants used excessive force against Plaintiff Anthony Stonecipher when they took him to the ground outside his home, at gunpoint, with fully automatic weapons," causing him to suffer undescribed "physical injury." *Id.* at 15, ¶¶ 98, 99.

Defendants contend that Anthony did not allege sufficient facts in his Amended Complaint to support a claim for excessive force, and, alternatively, they submit affidavits regarding the amount of force used.  The agents' affidavits state that Anthony got down on the ground as instructed, without any physical force applied by ATF agents; that Agent Tabullo patted Anthony down and handcuffed Anthony with his hands behind his back; and that when Anthony complained that the handcuffs caused his shoulder to hurt, an agent immediately re-handcuffed him with his hands in the front.  *See* Doc. 90-5 at 2, ¶¶ 7-8 (Jorgensen Aff.); Doc. 90-6 at 2, ¶¶ 7-9 (King Aff.);

18

Doc. 90-7 at 2, ¶¶ 7-9 (McCarthy Aff.); Doc. 90-8 at 2, ¶ 7 (Tabullo Aff.).  Anthony swears in his affidavit filed in response to this motion for summary judgment that he "began kneeling toward the ground, as ordered," but that "several officers then . . . handled [him] in a forcible way, pushing [him] toward the ground;" and that an unknown officer "placed his knee or hand on [Anthony's] back, causing [his] back injury."  Doc. 101 at 26, ¶¶ 4, 5 (Anthony's Aff.).

Anthony's sparse allegations in his Amended Complaint and affidavit, taken as true, however, do not "demonstrate the force used was objectively unreasonable," *Estate of Larsen*, 511 F.3d at 1259, or that his injury was more than de minimus, *Koch*, 660 F.3d at 1247-48.  "Should the officers move for qualified immunity on an excessive force claim, a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have not thought the force constitutionally permissible (violates clearly established law)." *Cortez*, 478 F.3d at 1128 ("We have little difficulty concluding that a small amount of force, like grabbing Rick Cortez and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment.").  As noted, the Amended Complaint and affidavit state that Anthony was "turn[ing] to leave back to the safety of his own home" just before he was "pushed" to the ground. Doc. 5 at 8, ¶ 41; Doc. 101 at 26, ¶ 4.  There are no allegations that the Defendants tackled Anthony or threw him to the ground or used any force in "placing" the knee or hand on his back.  Further, the Amended Complaint alludes to the incident "exacerbat[ing]" a previous back injury for which Anthony already took prescription medication, Doc. 5 at 5, ¶ 45, which indicates that the placing of the officer's hand or knee on Anthony's back did not cause the injury, but only increased his pre-existing pain.  Anthony does not allege that the Defendants knew about his pre-existing back injury. "We assess objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." *Estate*

*of Larsen*, 511 F.3d at 1260.

> 'Not every push or shove, even if it may later seem unnecessary in the peace of a
> judge's chambers, violates the Fourth Amendment. The calculus of reasonableness
> must embody allowance for the fact that police officers are often forced to make
> split-second judgments – in circumstances that are tense, uncertain, and rapidly
> evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 388. As a matter of law, under the circumstances as described by Anthony,

where it appears that he was trying to get back into his house after seeing the agents, it was not

objectively unreasonable for the agents to push him toward the ground and for one agent to "place"

his hand or knee on Anthony's back to keep him there while handcuffing him. Doc. 101 at 26, ¶ 4.

The Defendants are entitled to qualified immunity on the excessive-force claim.

**III.    Defendants are entitled to qualified immunity on Count VI**.

Melissa's Fourth-Amendment claim for unlawful seizure and false arrest is based solely on

her legal conclusion that her "seizure and detention . . . was without reasonable suspicion and

without probable cause to believe that Plaintiff was engaging in criminal activity." Doc. 5 at 16,

¶ 102. The Court has already concluded that the agents reasonably believed that they had probable

cause to search the Stoneciphers' house.

In *Michigan v. Summers*, the United States Supreme Court held that officers executing a

search warrant for contraband have authority "to detain the occupants of the premises while a proper

search is conducted" for the duration of the search, including occupants who are not suspected of

committing the crime associated with the search warrant. 452 U.S. 692, 705 (1981). An officer's

authority to detain an occupant of a house being searched does not depend on the "quantum of proof

justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* n.19. Applying

*Summers* to a case in which officers were investigating a gang-related, drive-by shooting and

searching for weapons and evidence of gang membership at a house where at least one armed male

gang member resided, and where the officers seized at gunpoint, detained, and handcuffed a female

occupant who was not a suspect during the duration of the search, the Supreme Court held:

> Inherent in *Summers'* authorization to detain an occupant of the place to be
> searched is the authority to use reasonable force to effectuate the detention. *See*
> *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989)
> ("Fourth Amendment jurisprudence has long recognized that the right to make an
> arrest or investigatory stop necessarily carries with it the right to use some degree of
> physical coercion or threat thereof to effect it"). Indeed, *Summers* itself stressed that
> the risk of harm to officers and occupants is minimized "if the officers routinely
> exercise unquestioned command of the situation." 452 U.S., at 703, 101 S. Ct. 2587.

> The officers' use of force in the form of [correctly-applied] handcuffs to
> effectuate Mena's detention in the garage . . . was reasonable because the
> governmental interests outweigh the marginal intrusion. . . .

> . . . . The governmental interests in not only detaining, but using handcuffs,
> are at their maximum when, as here, a warrant authorizes a search for weapons and
> a wanted gang member resides on the premises. In such inherently dangerous
> situations, the use of handcuffs minimizes the risk of harm to both officers and
> occupants. *Cf. Summers, supra*, at 702–703, 101 S. Ct. 2587 (recognizing the
> execution of a warrant to search for drugs "may give rise to sudden violence or
> frantic efforts to conceal or destroy evidence"). Though this safety risk inherent in
> executing a search warrant for weapons was sufficient to justify the use of handcuffs,
> the need to detain multiple occupants made the use of handcuffs all the more
> reasonable.

*Muehler v. Mena*, 544 U.S. 93, 98-100 (2005).

It is undisputed that the ATF agents, who knew that the Stoneciphers had multiple firearms

in the house and that Melissa had purchased many of them, patted down Melissa to make sure she

did not have a weapon, handcuffed her, and took her outside, but she was not handcuffed during the

entire duration of the search and she was never formally arrested or charged with any crime. *See*

Jorgensen Aff. at 3, ¶¶ 12-17; King Aff. at 3, ¶¶ 11-16; Estrada Aff. at 5, ¶ 24; Valles Aff. at 7, ¶

39. Melissa does not contradict this testimony, stating only in her affidavit that "[b]ecause of the

presence of several armed intruders in [her] home, [she] did not feel safe to leave the premises."

Doc. 101 at 31, ¶ 1. The Court concludes that the Defendants are entitled to qualified immunity on

this Count because there are no allegations to support a claim that the officers violated Melissa's constitutional rights.

**IV.    Defendants are entitled to qualified immunity on Count IX.**

Plaintiffs contend that all of the Defendants violated their First-Amendment rights because their "actions in wrongfully arresting and charging Plaintiffs without probable cause were undertaken in retaliation for [Anthony's] exercise of his protected right to freedom of speech." Doc. 5 at 18, ¶ 123. The Amended Complaint contends that the agents' "actions were undertaken following, and in response to, Plaintiffs' statements made in refusing to answer the officers' questions, asserting their Second Amendment rights," and because Anthony "informed them he had never been convicted of a crime, reading out loud his NCIC report" and "a letter from his Missouri criminal defense attorney." *Id.* at ¶¶ 124, 126-127. Plaintiffs' contentions are belied by the record.

Defendants contend that Melissa lacks standing to bring a *Bivens* claim for retaliation for exercising her First-Amendment rights because she" fails to allege any speech, fails to allege she was injured in any way, and fails to allege what action Federal Defendants took in retaliation for said speech." Doc. 90 at 52. Alternatively, they contend that she fails to state a cognizable retaliation claim for the same reasons. *See id.* The Court agrees.

> To establish a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct.

*Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009). Melissa does not submit any evidence, through an affidavit or otherwise, showing that she engaged in protected speech, and the Court has held that her detention during the search pursuant to a warrant was lawful and reasonable. The Defendants are entitled to qualified immunity on this claim.

Anthony's claim also fails.  Defendants present as an undisputed fact that, immediately after he was handcuffed, and before he asked to be permitted to find the letter, "Mr. Stonecipher was placed under arrest and placed into the rear of a police car.  Jorgensen Decl. at ¶¶ 6, 8; King Decl. at ¶ 8; McCarthy Decl. at ¶¶ 6, 8; Tabullo Decl. at ¶ 6."  Doc. 90 at 12, ¶ 49; *and see* Doc. 101 at 20, ¶ 49 ("Plaintiffs do not dispute ¶49 of Defendants' Statement of Undisputed Material Fact").

> The Defendants also submit undisputed evidence that, after Anthony was re-handcuffed,
>
> SA Valles and SA Estrada transferred Anthony Stonecipher from the police car to their government vehicle.  Immediately upon entering the [government vehicle] Mr. Stonecipher was read his Miranda rights.  Mr. Stonecipher also read his Miranda rights himself from ATF Form 3200.4.  Only after Mr. Stonecipher signed the waiver did ATF agents begin to interview him.  Valles Decl. at ¶¶ 35, 38; SA Estrada Decl. at ¶¶ 22-23.
>
> 57.  After he was arrested, but during the course of the search, Anthony Stonecipher retrieved a letter from a filing cabinet in his sun room.

Doc. 90 at 13, ¶¶ 56-57; Doc. 101 at 21, ¶¶ 56-57.  Thus, Anthony was arrested *before* he obtained and read the letter to the agents.  Further, Defendants have established that AUSA Jennings, and not SA Valles, made the decision to go forward with Anthony's prosecution after SA Valles informed AUSA Jennings of the letter and the NCIC reports, thus SA Valles is not liable for Jennings' decision to prosecute.  Anthony has presented no evidence of any kind that Anthony was arrested *after* he refused to answer questions or invoked his Second-Amendment rights, nor can he establish that SA Valles or any other Defendant caused his unlawful prosecution by withholding critical information that would exonerate Anthony.  As a matter of law, Defendants are entitled to qualified immunity on Count IX.

   **IT IS ORDERED** that the Defendants' motion for summary judgment [Doc.90] is GRANTED and the Stoneciphers' remaining claims are dismissed with prejudice.

**UNITED STATES DISTRICT JUDGE**